UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 NOV 15 A 10: C

U.S. DISTRICT COUR
NEW HAVEN, CT

CHERYL COUDERT,                    :

         Plaintiff,              :

                       :

         v.                          :    Docket No. 303 CV 0324 (MRK)

JANNEY MONTGOMERY SCOTT LLC,   :

         Defendant.              :    NOVEMBER 12, 2004

## DEFENDANT JANNEY MONTGOMERY SCOTT LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Janney Montgomery Scott LLC ("JMS") submits this Memorandum of Law in

Support of its Rule 56 Motion for Summary Judgment seeking to dismiss each and every count of

Plaintiff's Complaint dated February 24, 2003.

## INTRODUCTION

Plaintiff was employed by JMS for approximately seven years as a securities broker. Throughout

her tenure with JMS, Plaintiff consistently ranked as the least productive securities broker in the office in

which she was based. Plaintiff always had an excuse for her poor performance. Plaintiff initially blamed

her poor sales production numbers on her difficulty transferring her clients over from her prior employer.

Plaintiff next blamed her poor performance on her difficulties with the "hands on" management style of

her supervisor, Jack Engelskirger. In response, JMS transferred Plaintiff from its Darien office to its

Fairfield office. Once Plaintiff was transferred to the Fairfield office, Plaintiff complained that her

production numbers could only improve if JMS provided her with an office and a sales assistant,

perquisites Plaintiff's production numbers did not warrant. However, even after Plaintiff was provided an

office and a sales assistant, her production numbers still did not improve.

NYC_182452_1.DOC/JSTRETTON

On January 11, 2002, Plaintiff was terminated. By that point, her production numbers, which failed to meet JMS's minimum full payout requirements, were so low that her commission payments were no longer sufficient to cover her employee medical insurance premium contribution. Plaintiff's termination was based solely on Plaintiff's inadequate performance and her failure, over the course of nearly seven years, to attempt to generate new business and improve her poor production numbers. Discrimination, whether based on age or gender, played absolutely no role in the decision to terminate Plaintiff.

## PROCEDURAL BACKGROUND

Prior to commencing this action, Plaintiff filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities, which was considered duel filed with the Equal Employment Opportunities Commission, on July 3, 2002. *See Affidavit of Illegal Discriminatory Practice (Exhibit A)*. Pursuant to Title VII and the ADEA, district courts may only hear claims involving discriminatory acts that were first "raised before the EEOC and that occurred within 300 days of the date the EEOC charge was filed." *Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 189 (D.Conn. 2000); see also 29 U.S.C. 626(d); 42 U.S.C. 2000e-5(e)*. The three hundredth day preceding July 3, 2002 is September 7, 2001. Therefore, any claim of alleged discriminatory conduct occurring prior to September 7, 2001 is time barred. *Id.; see also Ruling and Order dated October 7, 2004, Coudert v. Janney Montgomery Scott LLC, Case No. 3:03cv324 (MRK)*.

## FACTUAL BACKGROUND

JMS is a limited liability corporation formed under the laws of the state of Delaware and is headquartered at 1801 Market Street, Philadelphia, Pennsylvania. For over one hundred and sixty-nine years, JMS has held itself out as a full service investment firm, dedicated to helping its clients identify and achieve their investment objectives. JMS has over seventy investment

NYC_182452_1.DOC/JSTRETTON

offices in various locations along the east coast, including offices located at 85 Old Kings

Highway North in Darien, Connecticut and at 2150 Post Road in Fairfield, Connecticut. Plaintiff

worked out of both the Darien and Fairfield offices while employed by JMS as a securities

broker.

As a securities broker, Plaintiff was responsible for selling securities and other

investment instruments on behalf of JMS. Plaintiff was compensated entirely by commission,

based on the volume of business she conducted. *Deposition of Plaintiff at 19 (Exhibit B)*.

## I.    THE DARIEN OFFICE

On February 27, 1995, Jack Engelskirger, branch manager of JMS's Darien office, hired

Plaintiff as a securities broker, also known as a "Registered Representative." *Deposition of*

*Plaintiff at 14-18 (Exhibit B); Notice of New Employee (Exhibit C)*. At the time, Plaintiff and

Engelskirger had known each other professionally for approximately twenty years. *Deposition*

*of Plaintiff at 15*. Notwithstanding his understanding that Plaintiff had left nearly every

brokerage house where she had previously been associated under bad circumstances,

Engelskirger hired Plaintiff because he thought she was a good broker with a good book of

business. *Deposition of J. Engelskirger at 38, 40-41 (Exhibit D); see also Deposition of Plaintiff*

*at 33-35 (testifying that she "didn't take kindly" to the management style of her manager at*

*Prudential Bache Securities), at 35-38 (testifying that, while employed by Tucker Anthony, she*

*transferred to its New Haven office due to difficulties she had with her manager), at 39-42*

*(testifying that, while employed in the New Haven office of Tucker Anthony, she had a*

*personality clash with the New Haven manager), at 81-82 (testifying that, while employed by*

*PaineWebber, her manager "was rude and demeaning and clearly didn't want a female in that*

*office"); Coudert v. PaineWebber Jackson & Curtis, 705 F.2d 78 (2d. Cir 1983)*. Engelskirger

NYC_182452_1.DOC/JSTRETTON

was convinced that Plaintiff, with his guidance, could be a productive broker. *Deposition of J. Engelskirger at 40, 87-88.* Plaintiff was fifty years old when she started with JMS. *Deposition of Plaintiff at 14.* Engelskirger was fifty-seven. *Deposition of Plaintiff at 14.*

Engelskirger was a "hands on" manager and repeatedly addressed with Plaintiff her poor work habits and lack of production. *See July 5, 1995 Memorandum (Exhibit E) (addressing Plaintiff's lack of production, failure to attend office meetings and poor office hours); July 7, 1995 Memorandum (Exhibit F) (memorializing Plaintiff's failure to adhere to the 8:30 a.m. arrival time, failure to achieve 500 gross per day in production and failure to cease completing crossword puzzles while at work); December 18, 1995 Correspondence (addressing Plaintiff's lack of production, poor business hours, inattention to work and absenteeism); June 7, 1996 Memorandum (Exhibit G ) (instructing Plaintiff to be at her desk by 9 a.m., produce $500 per day, prepare a written sales plan and notify the office of any absenteeism); see also Deposition of J. Engelskirger at 83, 86, 88 (Exhibit D); Deposition of Plaintiff at 90, 103, 108, 116 (Exhibit B).* For the most part, Plaintiff disregarded Engelskirger's directives and paid little heed to his warnings. *Deposition of Plaintiff at 45 (referencing the 7/5/95 Memo, Plaintiff testified: "And I'm not going to say I ignored it, but I didn't go by his rules. I couldn't work that way. That's not the way an experienced broker and financial planner works"), 90-95, 105 ("Q. . . . I understand that you did not start coming in at 8:30 a.m. A. Not on a daily basis. Q. You did not stop doing crossword puzzles? A. I probably did not do as many of them. Q. Did you gross 500 a day? A. No. Not every day"), 117-118.* Plaintiff's sales production numbers remained among the lowest of all full time producers throughout her time in the Darien office. *1995 Rep Ranking (Exhibit H); 1996 Rep Ranking (Exhibit I); Deposition of Plaintiff at 112, 239 (Exhibit B).*

NYC_182452_1.DOC/JSTRETTON

## II.     THE 1996 OFFICE HOLIDAY PARTY

In December of 1996, JMS held its annual holiday party at the Redding Country Club. *Deposition of Plaintiff at 258 (Exhibit B); Deposition of J. Engelskirger at 51-52 (Exhibit D).* While attending the holiday party, Plaintiff consumed a number of alcoholic drinks. *Deposition of Plaintiff at 259-260; Deposition of J. Engelskirger at 51-53.* At one point during the course of the evening, Plaintiff's trousers fell to the floor as she attempted to walk back to her table. *Deposition of Plaintiff at 259; Deposition of J. Engelskirger at 51-52.* Engelskirger, and his boss, Jack Doyle, who was also in attendance, were convinced that this incident was a byproduct of Plaintiff's alcohol consumption. *Deposition of J. Engelskirger at 51-54; Deposition of Plaintiff at 124.* Immediately thereafter, Plaintiff left the holiday party with her husband. *Deposition of Plaintiff at 259.*

Within a few days of the holiday party, Plaintiff met with Engelskirger and Doyle to discuss the incident. *Deposition of Plaintiff at 260-263 (Exhibit B); Deposition of J. Engelskirger at 52-54 (Exhibit D).* Rather than terminate Plaintiff, it was decided that Plaintiff would seek treatment for her alcoholism. *Id.* On February 5, 1997, Plaintiff checked into Silver Hill Hospital for treatment related to her alcoholism. *Deposition of Plaintiff at 124, 261-263; Deposition of J. Engelskirger at 53.*

## III.     THE FAIRFIELD OFFICE

In March of 1997, following her completion of the alcohol detoxification treatment at Silver Hill, Plaintiff joined the Fairfield office of JMS. *Deposition of Plaintiff at 133-136 (Exhibit B).* Once Plaintiff transferred, Engelskirger no longer had any supervisory authority over Plaintiff or influence over her employment status. *Deposition of J. Engelskirger at 72 (Exhibit D); Deposition of R. Avallon at 29, 32 (Exhibit J); Affidavit of R. Avallon, ¶ 4 (Exhibit K).* According to Plaintiff, her working

conditions improved dramatically once she joined the Fairfield office. *Deposition of Plaintiff at 63 ("Q. Did the office environment improve when you went to Fairfield? A. Yes. For a while"), at 266-267 (testifying that between March of 1997, when she arrived in Fairfield, and November of 1997, when the Fairfield office expanded, Plaintiff felt like she "was being treated like everybody else"), 133-136, 142-143; see also Facsimile dated January 5, 1998 from R. Coudert (Exhibit L) (wherein Plaintiff's husband writes that Plaintiff's "work environment and employment conditions have improved dramatically").*

With the exception of her first month in the Fairfield office, Richard Avallon served as Plaintiff's direct supervisor, and the Fairfield office branch manager, up until her termination on January 11, 2002. *Deposition of Plaintiff at 137-138, 204-205 (Exhibit B).* Plaintiff does not dispute that Avallon treated all of the brokers in the Fairfield office similarly. *Id. at 226-227.* In fact, Plaintiff testified that she had no difficulties with Avallon other than her seating position in the common area, otherwise known as the "bullpen." *Id. at 142-143.* To this day, Plaintiff acknowledges that the majority of her complaints about JMS concern Engelskirger and his management style. *Id. at 58 (testifying that the majority of her employment related problems at JMS stemmed from Engelskirger's management style); see also Deposition of R. Avallon at 48-49 (Exhibit J) (testifying that most of Plaintiff's unhappiness concerned her interactions with Engelskirger in the Darien office).*

Plaintiff's lack of an office, in other words, her seating placement in the common area, was her primary complaint about the Fairfield office. *Deposition of Plaintiff at 59, 66-67, 121, 142-143, 156, 217, 233 (Exhibit B); see also Deposition of R. Avallon at 56 (Exhibit J) (testifying that Plaintiff's only complaint about the Fairfield office was her lack of a private office).* Plaintiff does not, however, contend that her seating placement in the bullpen was due to any sort of discriminatory motive based on her age or gender. *Deposition of Plaintiff at 67.* She acknowledges that she was not the only broker seated in the bullpen, *Deposition of Plaintiff at 64-67, 121-124, 136, 233-236 (identifying Jack Henriques and Steve*

NYC_182452_1.DOC/JSTRETTON

*Kraus as brokers that also sat in the bullpen),* and that offices were available only to brokers whose production numbers warranted the award of an office. *Deposition of Plaintiff at 122 (acknowledging that Steve Kraus was moved out of the bullpen and into an office because his production numbers "were good enough so that he could demand that office"); see also Deposition of R. Avallon at 20; Affidavit of R. Avallon, ¶ 5 (Exhibit J).* Notwithstanding JMS's policy to reserve offices for brokers that generated strong production numbers, JMS, on November 17, 1999, made an exception for Plaintiff and granted Plaintiff, along with Jack Henriques, another broker, the use of an office. *Memo dated November 17, 1999 (Exhibit M) (instructing Plaintiff that an office was being provided to her for use in growing her business and increasing her production numbers); Deposition of Plaintiff at 121, 221-222, 274-275; Deposition of R. Avallon at 42-43 (testifying that JMS was hesitant to award Plaintiff an office because of her poor production numbers).* Plaintiff remained in this office for the remainder of her time at JMS. *Deposition of Plaintiff at 222.*

While Plaintiff testified that her work conditions greatly improved once she joined the Fairfield office, her poor work habits, however, did not change. *Deposition of R. Avallon at 95 (testifying that a typical day for Plaintiff consisted of arriving at eleven or twelve o'clock, doing crossword puzzles, and leaving early) (Exhibit J); see also Deposition of J. Engelskirger at 49-50 (Exhibit D) (testifying that Plaintiff would rarely arrive before 10:30 a.m., that she would take long lunches, complete crossword puzzles and leave early); Deposition of Plaintiff at 45, 93-95, 105.* Plaintiff's gross sales production numbers were reflective of her poor work ethic. As reflected in the table below, Plaintiff consistently attained the lowest gross production of all full time brokers during her tenure in the Fairfield office:

NYC_182452_1.DOC/JSTRETTON

| YEAR | PLAINTIFF'S GROSS PRODUCTION | FAIRFIELD BRANCH AVERAGE[1] | PLAINTIFF'S RANK / OUT OF |
|------|------------------------------|------------------------------|----------------------------|
| 1997 | $129,227.40[2] | $234,878.27 | 14/14 |
| 1998 | $88,453.41 | $280,766.85 | 15/15 |
| 1999 | $56,297.66 | $291,195.96 | 16/16 |
| 2000 | $113,831.54 | $362,771.94 | 13/13 |
| 2001 | $29,183.50 | $274,462.24 | 15/15 |

*1997 and 1998 Rep Ranking[3] (Exhibit N); 1999 Rep Ranking[4] (Exhibit O); 2000 and 2001 Rep Ranking[5] (Exhibit P).* Plaintiff does not dispute that she ranked as the lowest gross producer in the Fairfield office in every year she worked out of the Fairfield office. *Deposition of Plaintiff at 239-242.* Moreover, with the exception of Plaintiff's production for 1997, Plaintiff's production numbers consistently fell below the minimum office production requirement of $125,000.00 necessary to receive full commission payout. *November 27, 1996 Reduced Payout Memo (Exhibit Q); May 28, 1997Reduced Payout Memo (Exhibit R); December 22, 1998 Reduced Payout Memo (Exhibit S); see also Deposition of Plaintiff at 114; 144-148.* Failure to meet the minimum office production requirement of $125,000.00 resulted in a reduced commission payout capped at 25% of gross production. *Id.*

By the end of 2001, Plaintiff's production had reached an all-time low. Plaintiff grossed only $29,183.50, although the average attainment in her branch exceeded $274,000.00. *2000 and 2001 Rep Ranking (Exhibit P).* Plaintiff's gross production was so low that her commission

---

[1] Includes all full time producers located in the Fairfield office for the entire calendar year. Excludes Plaintiff's production numbers.
[2] Plaintiff's 1997 gross production includes her 1997 Fairfield gross production, $106,712.17, and her 1997 Darien gross production, $29,515.23. *1997 and 1998 Rep Ranking (Exhibit N); 1997 Rep Ranking for Darien (Exhibit W).*
[3] 1997 ranking and sales production number listed under "prior year" and 1998 ranking and sales production number listed under "current year." Neither Paul Kraus nor Christopher Monahan worked out of the Fairfield office for the entire 1997 calendar year. *Deposition of Plaintiff at 161-163, 240 (Exhibit B).*
[4] 1999 ranking and sales production number listed under "current year."
[5] 2000 ranking and sales production number listed under "prior year" and 2001 ranking and sales production number listed under "current year." Neither Andrew Pugh nor William McCart worked out of the Fairfield office for the entire 2000 calendar year. *Deposition of Plaintiff at 241-242 (Exhibit B).*

NYC_182452_1.DOC/JSTRETTON

payments, which, by this point, routinely failed to meet minimum office production requirement of $125,000.00 necessary to receive full commission payout, could not even satisfy her contribution to her medical insurance coverage plan. *Correspondence dated October 5, 2001 (Exhibit T); Correspondence dated November 8, 2001 (Exhibit U); Correspondence dated December 21, 2001 (Exhibit V); <u>see also</u> Deposition of Plaintiff at 166-168 (Exhibit B).*

On January 11, 2001, Plaintiff's employment with JMS was terminated. *Deposition of Plaintiff at 6 (Exhibit B).* Plaintiff's termination was based solely on her poor performance. *Affidavit of R. Avallon, ¶ 6 (Exhibit J); see also Deposition of R. Avallon at 94-96 ("This whole thing is about production and nothing else") (Exhibit J).*

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only where there is no genuine issue of material fact to be tried on a matter and the moving party is entitled to summary judgment as a matter of law. *Fed. R. Civ. P. 56(c); <u>Donahue v. Windsor Locks Board of Fire Comm'rs</u>, 834 F.2d 54, 57 (2d. Cir. 1987).* In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 91 L.Ed. 2d. 202, 106 S. Ct. 2505 (1986).* "The genuine issue aspect of summary judgment procedure requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside of the pleadings, from which material facts alleged in the pleadings can be warrantably inferred." *<u>United Oil Co. v. Urban Redevelopment Comm'n</u>, 158 Conn. 364, 378-79, 260 A.2d 596 (1969); <u>Van Dine v. Robert Bosch Corp.</u>, 62 F. Supp. 2d 644, 646 (D.Conn. 1999).* Indeed, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *<u>Zabelle v. Coratolo</u>, 816 F. Supp. 115, 119 (D. Conn. 1993); <u>see also Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at*

NYC_182452_1.DOC/JSTRETTON

249 (a legally sufficient opposition must submit admissible evidence that is more than "merely colorable"); *Hildabrand v. Diffeo P'ship, Inc.*, 89 F. Supp. 202, 205 (D. Conn. 2000). "The very purpose of summary judgment is to weed out those cases that are destined to be dismissed on a motion for directed verdict . . . ." *Weinstock v. Columbia University*, 224 F.3d 33, 49 (2d Cir. 2000).

## II.    PLAINTIFF'S SEX AND AGE DISCRIMINATION CLAIMS ARE INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT

Whether the charge is one of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") or of sex discrimination in violation of Title VII, it is Plaintiff's burden to establish not only that her termination was not for a legitimate reason, but also that it violated the provisions of either the ADEA or Title VII. *Weinstock v. Columbia University*, 224 F.3d at 42; *Van Dine v. Robert Bosch Corp.*, 62 F.Supp.2d at 647; *Dobrich v. General Dynamics Corp.*, 40 F.Supp.2d 90, 102 (D.Conn. 1999). The ADEA prohibits employers from discriminating because of age against any employee in the protected age group – over 40. *29 U.S.C. § 631(a)*. Title VII prohibits employers from discriminating against any employee because of the individual's sex. *42 U.S.C. 2000e-2(a)(1)*. An employer does not violate the ADEA if it takes adverse action against an employee in the protected age group for a reason other than the employee's age. *Tutko v. James River Paper Co., Inc.*, 1999 U.S. App. LEXIS 28455 at *4 (2d Cir. 1999) quoting *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("the ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age"). Likewise, an employer does not violate Title VII if it takes adverse action against an employee in a protected class for a reason that is not premised on the employee's race, color, religion, sex or national origin. *James v. New York Racing Association*, 233 F.3d 149, 154-155 (2d Cir. 2000). Under both statutes, the burden rests with Plaintiff to prove that her gender or age made the difference in her employer's decision to terminate her employment. *Id.* quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507.

Whether under the ADEA or Title VII, cases are analyzed in the manner outlined in McDonnell

Douglas Corp. v. Green, 411 U.S. 793 (1973). *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.

2001). The McDonnell Douglas test is a three-part test and involves a shifting of the burden of proof.

The first part of this test requires that Plaintiff establish a prima facie case of discrimination, which

requires that Plaintiff demonstrate membership in the protected class, satisfactory performance, discharge

and evidence that the discharge occurred under circumstances giving rise to an inference of

discrimination[6]. *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004); *Duncan v. New*

*York City Transit Authority,* 45 Fed. Appx. 14, 15-16 (2d Cir. 2002); *see also Thomas v. St. Francis*

*Hospital and Medical Center,* 990 F. Supp. 81, 86 (D.Conn. 1998); *Viola v. Philips Medical Systems of*

*North America,* 42 F.3d 712, 716 (2d Cir. 1994).

If Plaintiff establishes each element of her *prima facie* case, the burden then shifts to Defendant to

provide a legitimate nondiscriminatory reason for the discharge. Defendant's "burden to articulate

legitimate, nondiscriminatory rationales for Plaintiffs discharge is 'one of production, not persuasion,

involving no credibility assessment.' Defendant meets this burden if its evidence, 'taken as true, would

permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Soderberg v.*

*Gunther Int'l, Ltd.,* 2004 U.S. Dist. LEXIS 57380 at *3 (D.Conn. 2004) quoting *Reeves v. Sanderson*

*Plumbing Prod., Inc.,* 530 U.S. 133, 142 (2000) and *Schnabel v. Abramson,* 232 F3d 83, 88 (2d Cir.

2000) (internal quotation omitted).

After Defendant articulates a legitimate, nondiscriminatory reason for the discharge, the burden

shifts back to Plaintiff to demonstrate pretext by proving by a preponderance of the evidence that her age

or sex played a motivating force in the adverse employment action and that the employer's proffered

---

[6] While JMS denies that Plaintiff can satisfy her burden of establishing a prima facie case of discrimination, there is
no evidence that her discharge occurred under circumstances giving rise to an inference of discrimination, JMS will
not, for the purposes of this motion only, contest the prima facie case analysis given that the burden on Plaintiff to
establish a prima facie case is minimal.

explanation is unworthy of credence. _Weinstock v. Columbia University_, 224 F.3d at 42; _Vallone v. Lori's Natural Food Center, Inc._, 1999 U.S. App. LEXIS 26455 at *3 (2d Cir. 1999); _Van Dine v. Robert Bosch Corp._, 62 F.Supp.2d at 647; _Dobrich v. General Dynamics Corp._, 40 F.Supp.2d at 102; _Ferrand v. Credit Lyonnais_, 2003 U.S. Dist. Lexis 17202 at * (S.D.N.Y. 2003). It remains always Plaintiff's burden to prove discrimination existed. _St. Mary's v. Hicks_, 509 U.S. 502, 507, (1993).

### A.    Plaintiff's Substandard Performance Is a Legitimate and Nondiscriminatory Reason For Terminating Plaintiff's Employment

JMS has a legitimate, non-discriminatory reason for terminating Plaintiff's employment:  poor job performance.  Poor job performance is a legitimate, nondiscriminatory reason to terminate an employee. _Henkin v. Forest Laboratories, Inc._, 88 Fed. Appx. 478 (2d. Cir. 2004); _Grillo v. New York City Transit Authority_, 291 F.3d 231, 235 (2d. Cir. 2002); _Rick's Conde Nast Publications, Inc._, 6 Fed. Appx. 74, 77 (2d. Cir. 2001); _Rose v. Panolam Industries International, Inc._, 301 F.Supp.2d 239, 244 (D.Conn 2004); _Choate v. Transport Logistics Corp._, 234 F. Supp. 2d 125, 129-130 (D.Conn. 2004); _Olle v. Columbia University_, 332 F. Supp. 2d 599, 2004 U.S. Dist. LEXIS 16653 at *44 (S.D.N.Y. 2004).

Plaintiff's failure to demonstrate an acceptable level of job performance is fully supported by the record.  Plaintiff ranked last in gross sales production every year she worked out of the Fairfield office. _1997 and 1998 Rep Ranking_[7] (Exhibit N); _1999 Rep Ranking_[8] (Exhibit O); _2000 and 2001 Rep Ranking_[9] (Exhibit P); _Deposition of Plaintiff at 239-242._  In 2001, Plaintiff grossed only $29,183.50, far below the minimum production requirement of $125,000.00 and nearly two and a half times lower than the next lowest ranking broker in the Fairfield office.  _2000 and 2001 Rep Ranking_[10] (Exhibit P); _November 27, 1996 Reduced Payout Memo (Exhibit Q); May 28, 1997 Reduced Payout Memo_

---

[7] 1997 ranking and sales production number listed under "prior year" and 1998 ranking and sales production number listed under "current year."
[8] 1999 ranking and sales production number listed under "current year."
[9] 2000 ranking and sales production number listed under "prior year" and 2001 ranking and sales production number listed under "current year."
[10] 2000 ranking and sales production number listed under "prior year" and 2001 ranking and sales production number listed under "current year."

NYC_182452_1.DOC/JSTRETTON

*(Exhibit R); December 22, 1998 Reduced Payout Memo (Exhibit S); Deposition of Plaintiff at 65 (testifying that $130,000 – $140,000 would be considered "mediocre numbers"); at 114 (testifying that a broker should expect to be spoken to if production numbers fell below $125,000).* Plaintiff's gross production numbers were so low in 2001 that her commission payments were insufficient to satisfy her contribution to her employer sponsored medical insurance plan. *Correspondence dated October 5, 2001 (Exhibit T); Correspondence dated November 8, 2001 (Exhibit U); Correspondence dated December 21, 2001 (Exhibit V); Deposition of Plaintiff at 166-168.* Moreover, Plaintiff consistently failed to demonstrate to JMS that she intended to improve her production numbers. *Deposition of Plaintiff at 230-233, 280-281.* JMS's decision to terminate Plaintiff was legitimate and nondiscriminatory.

**B.**  **Plaintiff Cannot Satisfy Her Burden of Demonstrating Both That Her Performance- Based Termination Was a Pretext for Discrimination and that Intentional Discrimination Based on Her Age and Sex Was the True Motivating Force Behind Her Termination**

Production by JMS of a legitimate, non-discriminatory reason for its employment decision necessitates that any presumption of discrimination that may or may not have been established by the *prima facie* showing completely "drop out of the picture." *James v. New York Racing Association*, 233 F.3d at 154; *see also Duncan v. New York City Transit Authority*, 45 Fed. Appx. at 16; *Weinstock v. Columbia University*, 224 F.3d at 42. The burden now shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate, non-discriminatory reason is merely a pretext for discrimination. *Duncan v. New York City Transit Authority*, 45 Fed. Appx. at 16. "An employer's reason for termination cannot be proved to be a pretext for discrimination unless it is shown to be false and that discrimination was the real reason." *Van Dine v. Robert Bosch Corp.*, 62 F.Supp.2d at 647; *see also Weinstock v. Columbia University*, 224 F.3d at 42 ("the plaintiff must produce not simply 'some' evidence, but 'sufficient' evidence to support a rational finding that the legitimate, nondiscriminatory*

NYC_182452_1.DOC/JSTRETTON

*reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action"); Vallone v. Lori's Natural Food Center, Inc., 1999 U.S. App. LEXIS 26455 at \*3 (2d Cir. 1999); Dobrich v. General Dynamics Corp., 40 F.Supp.2d. at 102 ("to defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason"); Ferrand v. Credit Lyonnais, 2003 U.S. Dist. Lexis 17202 at \*23-24 ("The standard for proving pretext is not negligible: "A reason can not be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").* "To get to the jury, 'it is not sufficient to disbelieve the employer; the fact finder must also believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia University,* 224 F.3d at 42 quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 519; *Soderberg v. Gunther Int'l, Ltd.,* 2004 U.S. Dist. LEXIS 57380 at \*5. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated remains at all time with the plaintiff." *James v. New York Racing Association,* 233 F.3d at 154 quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 507. Plaintiff will be unable to satisfy her burden of demonstrating: (1) that her performance-based termination was a pretext for discrimination; and (2) that her termination was the result of discrimination based on her age and/or her sex.

**1.    Plaintiff Cannot Demonstrate That Her Performance Based Termination Was a Pretext For Discrimination**

Plaintiff was given every chance to succeed at JMS. In response to complaints from Plaintiff that she needed an office and a sales assistant in order to improve her performance, perquisites unwarranted by her production numbers, JMS provided Plaintiff with both an office and a sales assistant. *Memo dated November 17, 1999 (Exhibit M); Deposition of Plaintiff at 121, 217-220, 221-222 (Exhibit B).* Nevertheless, notwithstanding these perquisites, Plaintiff's production remained the worst in the office

- 14 -

and below the $125,000.00 minimum threshold for full commission payout. *1999 Rep Ranking[11]*

*(Exhibit O); 2000 and 2001 Rep Ranking[12] (Exhibit P).* Plaintiff does not dispute that her production

was the lowest in the Fairfield office each and every year she worked out of the Fairfield office.

*Deposition of Plaintiff at 239-242.* Plaintiff also does not dispute that her production, for every year

other than 1997, fell below the $125,000.00 production level. *Id.* Nor does Plaintiff dispute that she did

nothing different to attempt to bring in new clients so as to increase her production numbers. *Id. at 230-*

*233.* Plaintiff cannot demonstrate that her performance-based termination was a pretext for

discrimination.

### 2.      Discrimination Played No Role in the Decision to Terminate Plaintiff

### a)      Plaintiff Has No Direct Evidence of Discrimination

Plaintiff acknowledges that no one ever made any age or sex related comments or remarks about

Plaintiff's age or sex to her. When asked during her deposition if she had any evidence of discrimination,

Plaintiff testified that she did not and acknowledged that her claims are based on pure speculation.

*Deposition of Plaintiff at 62-63 (testifying that she cannot "recall" any examples of when she was treated*

*differently from others on account of her age or sex and explained that " . . . its hard when motivations are*

*not explained and reasons are not given, its - - it purely leaves you to speculate").* Plaintiff also cannot

produce any evidence that her age or sex was discussed when it was determined that Plaintiff would be

terminated on account of her unacceptable sales production numbers. Moreover, Plaintiff has not

produced even one document containing derogatory age or sex related comments. Plaintiff lacks any

direct evidence of intentional discrimination.

---

[11] 1999 ranking and sales production number listed under "current year."
[12] 2000 ranking and sales production number listed under "prior year" and 2001 ranking and sales production number listed under "current year."

NYC_182452_1.DOC/JSTRETTON

### b)     Plaintiff's Purported "Circumstantial Evidence" of Discrimination is Unpersuasive

Plaintiff's attempt to create circumstantial evidence demonstrative of intentional discrimination based on her age or sex is also entirely unpersuasive. Plaintiff was never denied resources, subjected to a reduced commission payout policy or treated differently on account of her age or sex. Any difficulties Plaintiff may have encountered while employed in the Fairfield office are attributable solely to Plaintiff's substandard sales production numbers.

### 1)     Plaintiff's Seating Assignment

Plaintiff's primary complaint regarding her "treatment" in the Fairfield office concerned her seating placement in the common area, otherwise known as the "bullpen." *Deposition of Plaintiff at 59, 66-67,121, 142-143, 156, 217, 233 (Exhibit B); see also Deposition of R. Avallon at 56 (testifying that Plaintiff's only complaint about the Fairfield office was her lack of a private office) (Exhibit J)*. While Plaintiff would have preferred a private office, she acknowledges that JMS's decision not to provide her a private office once the Fairfield office expanded was not due to any sort of discriminatory motive based on her age or gender. *Deposition of Plaintiff at 64, 67 ("Q. Just so I can understand you clearly, you don't have any reason to believe that you were placed in the bullpen because you were older or because you were a female? A. Not specifically . . .")*. Plaintiff also acknowledged that Avallon, the branch manager, treated all of the brokers in the Fairfield office similarly. *Id. at 226-227*. In fact, Plaintiff claims that her only issue with Avallon was that he failed to provide her with a private office once the office expanded. *Id. at 142-143*. Plaintiff's acknowledgment that intentional discrimination played no role in her seating placement precludes any relief under Title VII or the ADEA[13]. *Tutko v. James River Paper Co., Inc.,*

---

[13] Plaintiff also claims that JMS initially denied her a sales aide. *Deposition of Plaintiff at 217-219 (Exhibit B)*. Sales aides, like office assignments, are based on a broker's production numbers. *Affidavit of R. Avallon, ¶ 5 (Exhibit K); see also Deposition of Plaintiff at 62-63 (acknowledging that she has no evidence that her failure to initially obtain a sales assistance was due to intentional discrimination) (Exhibit B)*. Nevertheless, whether the claim is JMS's refusal to provide Plaintiff with an office or with a sales aide, the claim is time barred. Plaintiff was

*1999 U.S. App. LEXIS 28455 at \*4 quoting <u>Norton v. Sam's Club</u>, 145 F.3d at 120 ("the ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age"); <u>James v. New York Racing Association</u>, 233 F.3d at 154-155 (an employer does not violate Title VII if it takes adverse action against an employee in a protected class for a reason that is not premised on the employee's race, color, religion, sex or national origin).*

Even without Plaintiff's admission that her seating placement was not the result of intentional discrimination, no reasonable trier of fact could find discrimination. For instance, with regards to the office, Plaintiff cannot demonstrate that she was treated differently from any other similarly situated employee on account of her sex or age. *<u>Shumway v. United Parcel Service</u>, 118 F.3d 60, 64 (2d. Cir. 1997) (a fundamental evidentiary requirement is that plaintiff demonstrate that she was treated differently from other similarly situated employees on account of some impermissible criteria, such as the individual's gender); <u>Vallone v. Lori's Natural Food Center, Inc.</u>, 1999 U.S. App. LEXIS 26455 at \*4-5 (2d. Cir. 1999); <u>Ferrand v. Credit Lyonnais</u>, 2003 U.S. Dist. LEXIS 17202 at \*27 (S.D.N.Y. 2003) citing <u>Elmenayer v. ABF Freight Sys., Inc.</u>, 318 F.3d 130, 135 (2d Cir. 2003); <u>Ricks v. Conde Nast Publications, Inc.</u>, 6 Fed. Appx 74, 78 (2d. Cir. 2001); <u>Grady v. Affiliated Central, Inc.</u>, 130 F.3d 553, 561 (2d. Cir. 1997); <u>Rose v. Pandolam Industries International, Inc.</u>, 301 F. Supp. 2d 239, 243 (D.Conn. 2004); <u>Cooper v. Morgenthau</u>, 2001 WL 868003 at \*7 (S.D.N.Y. 2001)*. As Plaintiff testified during her deposition, Jack Henriques and Steve Kraus also remained in the bullpen once the Fairfield office expanded in November of 1997. *Deposition of Plaintiff at 64, 121-124, 235-236.* The fact that two males were also assigned to sit in the bullpen strongly suggests that gender was not a

---

provided a sales aide in March of 1999 and continued thereafter to have the use of a sales aide up until her termination on January 11, 2001. *Deposition of Plaintiff at 217-220 (Exhibit B)*. In November of 1999, Plaintiff was awarded an office and, similar to the sales aide, continued to have an office up until her termination. *Memo dated November 17, 1999 (Exhibit M); Deposition of Plaintiff at 121, 221-222 (Exhibit B)*. Plaintiff first filed a charge of discrimination with the CHRO on July 3, 2002. *Affidavit of Illegal Discriminatory Practice (Exhibit A)*. Because the issue regarding the sales aide and office were both resolved prior to September 7, 2001, which is 300th day preceding July 3, 2002, both claims are time barred. *29 U.S.C. 626(d); 42 U.S.C. 2000e-5(e); <u>see also</u> <u>Miner v. Town of Cheshire</u>, 126 F. Supp. 2d 184 (D.Conn. 2000)*.

NYC_182452_1.DOC/JSTRETTON

motivating factor in determining seating assignments. *Shumway v. United Parcel Service, 118 F.3d at 64; Vallone v. Lori's Natural Food Center, Inc., 1999 U.S. App. LEXIS 26455 at \*4-5; Ferrand v. Credit Lyonnais, 2003 U.S. Dist. LEXIS 17202 at \*27.*

Plaintiff also cannot demonstrate that age played a role in determining seating assignments. Not one of the three brokers that Plaintiff identified as older than her, namely, John Fortuna, Charles Cook and Al Baron, were seated in the bullpen. *Deposition of Plaintiff at 61, 64, 121-124, 235-236 (identifying Plaintiff, Henriques and Kraus as the only brokers that sat in the bullpen).* The fact that older brokers were not assigned to sit in the bullpen strongly suggests that age was not a motivating factor in determining seating assignments. *Grady v. Affiliated Central, Inc., 130 F.3d at 561; Cooper v. Morgenthau, 2001 WL 868003 at \*7.*

Finally, the record supports JMS's position that offices were reserved for those men and women who displayed a consistent ability to achieve the highest production levels. *Deposition of R. Avallon at 20 (Exhibit J); Affidavit of R. Avallon, ¶ 5 (Exhibit K); see also Deposition of Plaintiff at 122 (acknowledging seating was based on production).* Prior to being granted an office to share with Henriques in November of 1999, Plaintiff and Henriques were seated in the bullpen because Plaintiff and Henriques were the lowest producing full time brokers in the Fairfield office. *1997 and 1998 Rep Ranking (Exhibit N).* On the other hand, Steve Kraus, who was initially seated in the bullpen when he joined JMS in 1998, quickly developed into a strong producer and, as a result, was awarded an office in 1999. *1999 Rep Ranking (demonstrating that Kraus's production numbers grew from $58,144,41 in 1998 to $400,635.33 in 1999) (Exhibit O); see also Deposition of Plaintiff at 122 (acknowledging that Steve Kraus was moved out of the bullpen and into an office because his production numbers "were good enough so that he could demand that office").* Production, and production alone, determined who would be provided a private office and who would be

assigned to sit in the common area. There is absolutely no evidence to suggest that Plaintiff's

seating assignment, including the decision to allow her to share an office with Henriques rather

than provide her with a private office, was based on anything other than her production numbers.

2)      **Plaintiff's Reduced Commission Structure**

While Plaintiff testified that the lack of a private office was her primary complaint, Plaintiff also

complains that the reduction in her commission structure was discriminatorily motivated. Once again,

Plaintiff cannot demonstrate that she was treated differently from other similarly situated employees on

account of her gender or age. *Shumway v. United Parcel Service*, 118 F.3d at 64; *Grady v. Affiliated*

*Central, Inc.*, 130 F.3d at 561.

In November of 1996, JMS instituted a policy whereby brokers in the New England region that

failed to achieve a minimum production level of $125,000.00 would be paid at a reduced commission

rate. *November 27, 1996 Reduced Payout Memo (Exhibit Q); see also May 28, 1997Reduced*

*Payout Memo (Exhibit R); December 22, 1998 Reduced Payout Memo (Exhibit S); Deposition of*

*Plaintiff at 114, 144-148 (Exhibit B).* The reduced commission payout policy was based on each

individual broker's production numbers. *November 27, 1996 Reduced Payout Memo; Deposition*

*of Plaintiff at 197.* Plaintiff acknowledges that this policy applied to every broker in the Fairfield

office. *Deposition of Plaintiff at 114, 145, 148.* Moreover, Plaintiff does not dispute that her

production numbers for 1998, 1999, 2000 and 2001 failed to exceed $125,000.00. *Deposition of*

*Plaintiff at 239-242; see also 1998 Rep Ranking (Exhibit N); 1999 Rep Ranking (Exhibit O);*

*2000 and 2001 Rep Ranking (Exhibit P).* The fact that Plaintiff does not dispute that this policy

was applicable to the entire office or that her production numbers subjected her to the policy,

coupled with the lack of any evidence suggesting that this policy was created to single out

Plaintiff on account of her gender or age, renders Plaintiff's claim of discrimination nothing more

NYC_182452_1.DOC/JSTRETTON