UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHERYL COUDERT,                                    :
                                                   :
                    Plaintiff,                     :
                                                   :
            v.                                     :      Docket No. 303 CV 0324 (JBA)
                                                   :
JANNEY MONTGOMERY SCOTT, LLC,                      :
                                                   :
                    Defendant.                     :      NOVEMBER 12, 2004

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO PRECLUDE EXPERT TESTIMONY OF DEBORAH LINK**

**INTRODUCTION**

Plaintiff's expert, Deborah Link, M.D. ("Link"), should be precluded from testifying at

trial because Plaintiff never disclosed Link as an expert, and because Link has not provided a

complete expert report pursuant to Federal Rule of Civil Procedure 26(a)(2).  A treating

physician's testimony will be subject to the requirements of Rule 26(a)(2) if Plaintiff's intent is

to introduce it as expert testimony.  A treating physician's testimony constitutes expert testimony

when the physician is called testify as to causation or to provide opinions based on specialized

knowledge or facts which go beyond the physician's personal knowledge.  Plaintiff's

Interrogatory responses and Link's Letter to Attorney Bowman indicate that Link will testify as

to whether Defendant's conduct caused Plaintiff's injuries as well as additional information

beyond her personal knowledge.  See Plaintiff's Responses to Interrogatories, ¶ 13, attached as

Exhibit A; See Link's Letter to Bowman, 2/9/04, attached as Exhibit B.  Any testimony on these

subjects areas would subject Link to the requirements of Rule 26(a)(2).  Because Plaintiff neither

identified Link as an expert witness, nor produced an accompanying expert report meeting the requirements of Rule 26(a)(2), Link should be precluded from testifying at trial.

Link's testimony should also be excluded to the extent that she intends to testify as to legal conclusions. Experts many not testify as to legal conclusions, and their testimony will be excluded on this basis. Link's letter to Bowman indicates that she will testify as to whether Plaintiff was subjected to age or gender discrimination. See Link's Letter to Bowman, 2/9/04, attached as Exhibit B. Because this testimony constitutes a legal conclusion, it must be excluded.

## **FACTS**

Plaintiff intends to call Link, a licensed psychiatrist, as a witness at trial to testify as to Plaintiff's psychiatric condition, the impact of Defendant's allegedly discriminatory conduct towards Plaintiff, and the causal relationship between Defendant's conduct and Plaintiff's alleged emotional distress. See Plaintiff's Responses to Interrogatories, ¶ 13, attached as Exhibit A.

The letter Link submitted to Attorney Bowman indicates that she will opine on her diagnosis of Plaintiff as well as the alleged causal relationship between Plaintiff's work environment, subsequent termination, and Plaintiff's diagnosis and symptoms. See Link's Letter to Bowman, 2/9/04, attached as Exhibit B. It is anticipated that Link will testify that Plaintiff does not have a depressive illness, and that she has never diagnosed Plaintiff with or prescribed medication for a mood disorder. See Id., p. 2. Link will testify that Plaintiff has been affected by Defendant's "persistent lack of professional support" and discontinuation of Plaintiff's employment. Id. Her position is that the stressful employment situation and termination caused a "continuing psychic toll" on Plaintiff. Id. Link distorts the facts by stating that Plaintiff's

STM_182574_2/TKADAR

acute drinking and hospitalization in 1997 was allegedly caused by the "toxic employment situation" in Defendant's Darien office. Id. According to Link, "the way [Defendant] treated [Plaintiff] has, effectively made it impossible for her to find new employment at her lifelong work." Id. Finally, Link will testify that she diagnosed Plaintiff with alcohol dependence, remission, GAF, and determined that Plaintiff's "Axis IV Psychosocial stressors are currently high due to the work situation." Id.

## ARGUMENT

I. **Plaintiff's Treating Physician is Subject to the Requirements of Fed.R.Civ.Pro. 26(a)(2).**

Although courts have identified a distinction between experts "retained or specially employed to provide expert testimony" and treating physicians, a treating physician's testimony will be subject to the requirements of Rule 26(a)(2) if the intent is to introduce it as expert testimony. Musser v. Gentiva Health Services, 356 F.3d 751, 757 (7th Cir. 2004). Treating physicians must be disclosed pursuant to Rule 26(a)(2) when the physician is called to provide opinions based on specialized knowledge. Id. A treating physician's testimony qualifies as expert testimony if it consists of opinions based on scientific, technical, or other specialized knowledge, regardless of whether those opinions were formed during the scope of the interaction with the party. Id. at 757, n.2.

A treating physician should not be distinguished from other experts when the treating physician is offering expert testimony regarding causation. Id. A treating physician must therefore comply with the requirements of Rule 26(a)(2) if he or she is to provide expert testimony. Id. at 757. The court in Ordon v. Karpie found that the treating physician's testimony as to the cause of certain conditions was based upon facts beyond the scope of those made known to him in the course of the care and treatment of the patient. 223 F.R.D. 33, 36 (D.

- 3 -

Conn. 2004) (requiring expert to supplement his report).  See also <u>King-Hardy v. Bloomfield Board of Education,</u> No. Civ. 3:01CV979 (PCD), 2002 WL 32506294 at *5, n.5 (D. Conn. Dec. 8, 2002).

A physician acts as an expert witness if she testifies to matters beyond her personal knowledge.  <u>King-Hardy,</u> 2002 WL 32506294 at *5, n.5.  The <u>Ordon</u> court noted that, "[w]hen the physician's proposed opinion testimony extends beyond the facts made known to him during the course of the care and treatment of the patient, he becomes subject to the provisions of Fed.R.Civ.P. 26(a)(2)(B)."  <u>Id</u>. *citing* <u>Wreath v. U.S.,</u> 161 F.R.D. 448, 450 (D. Kan. 1995).

In the instant case, Plaintiff's expert intends to testify as to the effect that the allegedly stressful employment situation had on Plaintiff.  See Link's Letter to Bowman, 2/9/04, attached as Exhibit B, p. 2.  Plaintiff's expert will posit that Defendant's actions caused Plaintiff's drinking problem and hospitalization, and imposed a psychic toll on Plaintiff.  <u>Id.</u>  It is anticipated that she will testify as to Defendants' executives' alleged attempts to avoid Plaintiff, and to the increase in sources of stress associated with Plaintiff's move to Defendant's Fairfield office.  <u>Id.</u> at p.1-2.  It is also anticipated that Dr. Link will attempt to insert exaggerated and inaccurate descriptions of Plaintiff's allegedly "aberrant," "conflicted," and "toxic" work situation.  <u>Id.</u>

Plaintiff's physician qualifies as an expert because her testimony will go beyond the scope of a treating physician, encompassing testimony regarding causation and testimony based on facts and specialized knowledge which go beyond matters within her personal knowledge.

STM_182574_2/TKADAR

## II.    Plaintiff's Expert Testimony Should be Precluded for Failure to Disclose Link as an Expert and for Failure to Provide a Complete Expert Report under Federal Rule of Civil Procedure 26(a)(2).

### A)  Plaintiff Did Not Disclose Link as an Expert.

Discovery closed on August 31, 2004. Prior to the close of discovery, the scheduling order provided that the Joint Trial Memorandum would be due on October 15, 2004[1]. Therefore, pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiff was required to disclose all expert witnesses by August 15, 2004. Plaintiff did not disclose Dr. Link by August 15, 2004 and, to date, Plaintiff has not disclosed any expert witnesses in compliance with Rule 26(a)(2).

Plaintiff failed to disclose Link as an expert by August 15, 2004 or reasonably thereafter, as required by Federal Rule of Civil Procedure 26(a)(2). Link should therefore not be permitted to testify at trial. See Prieto v. Malgor, 361 F.3d 1313, 1318 (11th Cir. 2004); Croom v. Western Connecticut State University, No. Civ. 3:00CV1805(PCD), 2002 WL 32503668, at *2 (D. Conn. Apr. 3, 2002).

### B)  Plaintiff's Letter to Bowman is Incomplete and Insufficient.

Under Federal Rule of Civil Procedure 26(a)(2), an expert report must disclose the data and any other information the expert considered in forming his or her opinion, the expert's qualifications, publications authored, the amount of compensation to be paid for his or her testimony, and a list of other cases in which the expert has testified[2]. Fed.R.Civ.P. 26. The court

---

[1] Subsequent to the close of discovery, the scheduling order was modified to extend the dispositive motion deadline and the Joint Trial Memorandum deadline by thirty days. This modification should not affect the deadline by which Plaintiff was required to disclose an expert witness as the new theoretical disclosure deadline would be September 15, 2004, which would be after the close of discovery. Nevertheless, regardless of which date is used, Plaintiff missed the deadline.

[2] Pursuant to Fed.R.Civ.P. 26(a)(2)(B), an expert report shall contain:
"a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years."

STM_182574_2/TKADAR

in <u>Ordon v. Karpie</u> found that the expert's failure to state a basis for his opinion in detail rendered his report insufficient. 223 F.R.D. at 35. Because the report did not reference particular documents, records, or tests, it was insufficient under Rule 26. <u>Id</u>. The court explained that the data and information must include references to what the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed. <u>Id</u>. The report was deemed insufficient because it did not offer a basis upon which Defendants could depose the expert and prepare a defense. <u>Id.</u> at 36.

The letter produced by Plaintiff in this case is incomplete as an expert report on a number of bases. See Fed.R.Civ.P. 26; <u>Ordon v. Karpie</u>, 223 F.R.D. at 35. Link's letter fails to provide a complete statement of all opinions to be expressed and the basis and reasons supporting those opinions. See Link's Letter to Bowman, 2/9/04, attached as Exhibit B. Beyond regular patient visits, Link's letter does not indicate the data, medical journals, or other information she considered in forming her opinions. <u>Id</u>. The letter fails to confirm whether any exhibits will be used as a summary of or support for her opinions as required by Fed.R.Civ.P. 26(a)(2)(B). It omits Link's qualifications, including a list of all of Link's publications from the preceding ten years. <u>Id.</u> It does not indicate what she will be paid as compensation for her testimony, nor does it include a list of any other cases in which she has testified as an expert at trial or by deposition within the preceding four years. <u>Id.</u> Link's letter is based entirely on opinion and exaggerated facts, and lacks any medical support or references.

STM_182574_2/TKADAR

**C) <u>Expert Testimony Should be Precluded Based on Plaintiff's Failure to Disclose Link as and Expert and Provide a Complete Report under Fed.R.Civ.Pro 26(a)(2).</u>**

Any party that fails to disclose the information required by Rule 26(a)(2) is not permitted to use the witness as evidence at trial. <u>Prieto v. Malgor</u>, 361 F.3d 1313, 1318 (11th Cir. 2004) *citing* Fed. R. Civ. P. 37(c)(1); <u>Croom v. Western Connecticut State University</u>, No. Civ. 3:00CV1805(PCD), 2002 WL 32503668, at *2 (D. Conn. Apr. 3, 2002) (*citing* Fed. R. Civ. P. 37(c)(1)); <u>King-Hardy v. Bloomfield Board of Education,</u> No. Civ. 3:01CV979 (PCD), 2002 WL 32506294 at *5 (D. Conn. Dec. 8, 2002); <u>Day v. Consolidated Rail Corp.</u>, No. 95 CIV 968(PKL), 1996 WL 257654 at *4 (S.D.N.Y. May 15, 1996). The plaintiff in <u>Croom</u> intended to introduce testimony from his treating physicians and psychologists, but failed to serve an expert report on defendants. 2002 WL 32503668 at *2. Because the plaintiff did not provide an expert report, defendant's motion to preclude expert testimony was granted. <u>Id.</u> at *3.

Likewise, because Plaintiff did not disclose Link as an expert and because Link's letter to Bowman did not comply with Federal Rule of Civil Procedure 26(a)(2), Link should be precluded from testifying in this case.

**III.     <u>Plaintiff's Expert Cannot Testify as to Legal Conclusions.</u>**

An expert may not testify as to legal conclusions. <u>Donellan v. Ferag, Inc.,</u> 26 Fed. Appx. 72, 75, 2002 WL 63581 (2d Cir. 2002). An expert's testimony will be excluded to the extent that it communicates legal standards or conclusions. <u>Id.</u>

Link's letter to Bowman suggests that Plaintiff suffered both age and gender discrimination by stating that the lack of support Plaintiff felt while employed by Defendant was "derived from her position as an 'older' . . . employee" or from her position as a female. See Link's Letter to Bowman, 2/9/04, attached as Exhibit B, p.2. Link further states that Plaintiff

"was born in 1944 . . . and I believe this fact has been an important determinant over this past decade." These statements amount to legal conclusions regarding age and gender discrimination, and as such must be excluded.

## **CONCLUSION**

For the foregoing reasons, Deborah Link should be precluded from testifying as an expert at trial.

THE DEFENDANT
JANNEY MONTGOMERY SCOTT, LLC
BY ITS ATTORNEYS,

_____

Marc L. Zaken (CT 03110)
mzaken@edwardsangell.com
John G. Stretton (CT 19902)
jstretton@edwardsangell.com
EDWARDS & ANGELL, LLP
Three Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901
(203) 353-6819

STM_182574_2/TKADAR

## CERTIFICATE OF SERVICE

This is to certify that a copy of Defendant's Memorandum in Support of its Motion to Preclude Expert Testimony was mailed via first class mail, postage prepaid to counsel for the Plaintiff, addressed as follows:

Andrew B. Bowman, Esquire
1804 Post Road East
Westport, CT 06880

This 12ᵗʰ day of November, 2004.

_____
John G. Stretton

STM_182574_2/TKADAR

# *EXHIBIT A*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHERYL COUDERT,                          :

        Plaintiff,               :

VS.                                      :          DOCKET NO: 3:03CV0324(MRK)

JANNEY MONTGOMERY SCOTT,                 :
LLC,

        Defendant                :          OCTOBER 20, 2003

### PLAINTIFF'S RESPONSES TO DEFENDANT'S
### FIRST SET OF INTERROGATORIES

1.  Identify yourself in full by providing your name; any other names by which you have been known; date of birth; social security number; current residence and business address(es); marital status; and current employment and occupation.

**Response:  Cheryl Fisher Coudert, Cheryl Ann Fisher (Maiden Name); d/o/b: 6/23/44; social security number 374 50 7506; current residence: 76 Sturbridge Hill Road, New Canaan, Connecticut 06840; Married; Unemployed.**

2.  Identify each person, other than counsel, who assisted you in answering these interrogatories.

**Response:  No other person assisted in answering these interrogatories other than counsel.**

3.  Identify all persons, other than counsel, who have knowledge of the facts concerning the claims you are asserting against JMS. For each such person, provide a full name and current address and a summary of the knowledge that you believe such person possesses.

**Response:   Richard Avallon, branch manager, JMS, Fairfield, Connecticut; MaryAnn Melchiorre, JMS, Philadelphia, PA.; Jack Engelskirger, formerly of JMS, Wilton, Connecticut; Larry Doyle, regional manager – JMS formerly located in New York; Ash Eldredge, JMS, Philadelphia, PA; Ron Beradino, (retired) JMS, New York City; Jim Wolitarsky, JMS, Philadelphia, PA.; Camille A. Ellis, Philadelphia, PA.; Peggy Derby, Philadelphia, PA; Jim McKenna, JMS, Darien, Connecticut. Each of these individuals have knowledge of the discriminatory actions taken against plaintiff by Janney Montgomery Scott from 1995 through and including the time of her termination; Walter Briggs, JMS, Darien, Connecticut who was aware of the taking of clients from plaintiff and reassignment to Mr. Briggs.**

4.  Describe your employment history before and after your employment with JMS. For each employer, state: the name and address of your employer; the name and address of the location at which you worked, if different; the dates during which

you worked for your employer; every position you held with your employer; the dates on which you held each position; the identify of each of your supervisors, including last known address and telephone number; whether you were employed full-time or part-time; your average weekly hours; your compensation and benefits; and if you no longer work for that employer, the circumstances surrounding the end of your employment with the employer.

**Response:  a) Tucker Anthony – 8/87 – 2/95, Stamford and New Haven.  Plaintiff was Vice-President – Investments, broker; supervisors were Jim English, Richard Sabo and Nick Frost.  Jim English is managing the JMS office in New Haven.  Full time employee, average weekly hours were 30; commission, profit sharing and medical.  Left Tucker to take job at JMS, Darien.**

**b) Prudential Securities – 8/81 – 8/87, Darien and Stamford, Connecticut; Vice-President, Investments and broker; supervisors were James Hosp, Carleton Cleveland and Lou Foran.  Carleton Cleveland is running the Fairfield Merrill Lynch Office, full-time, average weekly hours 30-35; commission and medical benefits.  Left Prudential to take job with Tucker Anthony.**

**c) Paine Webber – 3/73 – 8/81, Stamford, Fairfield and Bridgeport Connecticut, broker and manager's assistant (first 5 years); supervisors were**

3

**Tom Nash, Will Montminy and Mickey Phillips.    Tom Nash, Boston, MA, regional manager of Tucker Anthony; Will Montminy is retired in California; Mickey Phillips, Boston, MA.; full-time while assistant – 40 hours and as broker – 30-35 hours.    Salary plus commission, straight commission.    Left Paine Webber to take job with Prudential Securities (litigation with Paine Webber regarding statements made by Paine Webber on U-5).**

**d) Laird, 3/71- 3/73, New Canaan, Connecticut, registered assistant; supervisor was Ted Winpenny; Stuart, Florida, Merrill Lynch, part-time; salary plus bonus.  Left Laird to take job with Paine Webber.**

**e) Paine Webber, 5/68 – 9/70, 140 Broadway, New York City, receptionist, secretary, registered secretary, supervisors were Frank Kelly and Ash Eldredege; full-time – 40 hours weekly, salary, left New York City in September 1970.**

5.    Describe all efforts to obtain temporary or permanent employment from January 2002 to the present.  Include in such description those periods of time during which you did not actively seek employment, as well as those period of time during which you were incapable of obtaining employment because of illness, incarceration, incapacity or travel outside the United States.

4

**Response:**  **Plaintiff has not sought employment solely because her clients were taken from her by defendant JMS and reassigned to Walter Briggs leaving plaintiff without clients.**

6.  Identify and describe any schooling, training or professional development courses which you have taken, or which you have applied to take, since your employment with JMS.

**Response:  None.**

7.  Identify each and every occasion on which you complained to any employee, agent or representative of JMS about any alleged discrimination and/or retaliation against you, stating: the date the complaint was made; the person to whom the complaint was made; the form of the complaint (e.g. letter, in-person meeting); the substance of the complaint, and the identity of any other persons who were present when the complaint was made.

**Response:  (a)  July 25, 1996 letter to James Wolitasky; (b) December 8, 1997 – Memo to Larry Doyle; (c) January 14, 1997 letter from Rene J. Coudert to MaryAnn Melchiorre; (d) letter from plaintiff to Jack Engelskirker dated January 9, 1997; (e) letter from plaintiff to Larry Doyle with copy to Dick Avallon dated December 8, 1997; (f) Memo from Rene Coudert to MaryAnn Melchiorre and**

Howard Scherer dated January 5, 1998 referencing plaintiff's letter to Wolidarsky dated July 26, 1996; (g) Scherer letter to Neigher dated February 24, 1997; (h) verbal conversation of 1998 between plaintiff and Avallon in which plaintiff tells Avalon that she needs privacy, a sales aide, dignity and peace and quiet in order to do her job.  Plaintiff advised Avalon that keeping her in the bullpen was affecting her ability to do the job.  Rather than be responsive to plaintiff's repeated requests, in December 1998 Avallon, who informed plaintiff that her payout would be reduced to 25%; 1999 Sales Plan submitted to Dick Avallon by plaintiff; (i) Memo dated 8/24/00 from Jack Miller to Richard Avallon and Cheryl Coudert which reflects the penalty imposed by JMS upon Cheryl Coudert which was a direct result of the discriminatory treatment inflicted by JMS on plaintiff by denying her the resources to do her job.  (j) Late January 2001 memo to Ash Eldredge from plaintiff setting forth chronologically the discriminatory treatment imposed and inflicted upon her by JMS; (k) February 14, 2001 response from Ash Eldredge to plaintiff;  (l) plaintiff received letters from Peggy Derby in the payroll department of JMS dated October 5, November 8 and December 21, 2001 seeking funds from plaintiff to pay medical insurance premiums.  These demands on plaintiff by JMS were a direct result of JMS's

own discriminatory conduct inflicted upon the plaintiff which caused her commission pay out to be reduced to 25%. Plaintiff complained to Ms. Derby that funds were being demanded of plaintiff by JMS precisely because JMS had reduced her commission payment as a result of discrimination thereby creating a reduced fund from which medical insurance premiums could be paid. Therefore, plaintiffs commission payout was reduced by JMS thereby rendering her commission structure insufficient to pay medical insurance premiums. In these two respects JMS was motivated by discrimination on account of plaintiff's age and gender; (m) January 11, 2002 letter from Derby to plaintiff demanding more money for medical insurance; (n) In response to a February 15, 2002 letter from Ellis, plaintiff called Ellis to complain that her vested account balance in her profit sharing plan of $13,147.92 should not be held up until January 2007 as JMS intended to do; (o) In February 2002 plaintiff contacted Jerry Murphy of JMS in Philadelphia to complain about her U-5 and called again on 3/9/02. There was no response from JMS.

8.  Describe any and all contract or communications, whether oral or written, between you and any employee, agent or representative of JMS between January 2002 and present and concerning, addressing or referencing any of the claims

identified in the complaint.  Identify the individual with whom the contact was made, the date(s) of any such contacts or communications and the substance thereof.

**Response:  Jerry Murphy as described in the response to Interrogatory 7 above and Peggy Derby as described in the response to Interrogatory 7 above.**

9.    State whether you have ever been a plaintiff in any civil action, or a complainant in any administrative proceeding, brought against any of your employers other than JMS.  For each such matter, state the title and docket number of the action or proceeding, identify the court or agency, the employer, the nature of your claim, and the current status or disposition thereof.

**Response:    Coudert vs. Paine Webber, 705 F.2d 78 (2nd Cir. 1983) and subsequent district court proceedings which resulted in settlement between the parties.**

10.    Itemize all elements of damages you claim against JMS, and for each element state the amount of damages you are claiming; the manner in which you calculated the damages; and the basis for your claim that you are entitled to that element of damages.

**Response:  The following are elements of damage:  back pay based upon the annualized compensation in 1997 of $81,227.00.  Plaintiff worked for 9 months**

during 1997, and her gross pay was $60,922.00. The annualized pay for 12 months is equal to $81,227.00. For each year of her employment, the damages would be the difference between the wages actually paid and $81,227.00. For every year commencing with her termination, damages would equal $81,227.00 per year as back pay until the time of trial. From the time of trial forward plaintiff claims front pay through age 65.

The plaintiff also claims damages relating to the infliction of emotional distress by the defendant for which she seeks fair, just and reasonable compensation in accordance with law. Also, are medical expenses in connection with psychiatric treatment from Deborah Link, M.D. Plaintiff also seeks liquidated damages pursuant to the ADEA and attorney's fees on the First Claim for Relief and punitive damages in her Second Claim for Relief under Title VII as well as attorney's fees and costs.

11. Describe in detail any and all physical and emotional injury, pain or suffering that you claim you have suffered, or continue to suffer, as a result of the facts set forth in your complaint. For each such injury, identify: the date of onset; every doctor, psychiatrist, therapist, social worker or other healthcare provider whom you have seen; the dates of such treatments; the costs of such treatments; any

diagnosis or prognosis you have received as a result of your medical consultations; whether these injuries prevent you from seeking or continuing in gainful employment; and whether you suffered or experienced a similar condition in the past, and if so, indicate when, from what and whether you sought treatment.

**Response:  Deborah Link, M.D., 97 Marvin Ridge Road, New Canaan, CT 06840. The diagnosis ( speak to  psychiatrist)**

12.  Identify, by source and amount, all income you received or are receiving since January 2002.

**Response:  The total income received by plaintiff during 2002 is $26,600.00.**

13.  Identify each person you intend to call as an expert witness at trial, and as to each person identified state: the qualifications of the expert and the subject matter on which the expert is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; and provide a summary of the grounds for each opinion.

**Response:  We expect to call as an expert witness at trial Deborah Link, M.D., a licensed psychiatrist who will testify to the psychiatric condition of the plaintiff and the impact of the defendant's discriminatory conduct toward the plaintiff resulting in the emotional distress and harm to plaintiff.**

14.  If you have obtained any signed or unsigned statements, whether recorded or written, of any witnesses or other persons who have knowledge of any facts in this action, identify the name and address of each such person; the date of the statement; the form of the statement, whether written, oral, or by recording device/stenographer; to whom the statement was made; whether the statement was signed; and in whose custody the statement is now located.

**Response:  None.**

15.  Identify whether plaintiff has made any statement to any person regarding the events or happenings referenced in the complaint and, if so, identify the person to whom such statement was made; the date of the statement; the form of the statement, whether the statement was signed; and in whose custody the statement is now located.

**Response:  None.**

16.  If you have ever been convicted of a crime or have any criminal charges pending against you, for each such conviction or charge, please state: the dates and location of arrest, arraignment, indictment, conviction and incarceration; the court that convicted you; the charges on which you were convicted; and the docket number of the proceedings.

**Response:** **No.**

17. With respect to the allegations set forth in paragraph 5 of the complaint wherein you allege that defendant "fraudulently concealed the claims and causes of action set forth herein." identify: all facts that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response:** **From 1995 through and including the date of plaintiff's termination, the defendant did conceal from her the defendant's motivation and concerted course of action, the objective of which was to drive her from her employment with the defendant which included isolation of plaintiff, denial to the plaintiff of the resources with which to do her job, humiliated and embarrassed plaintiff and manipulated her in a way that she could not see the true motivation of the defendant. All persons having knowledge of these allegations are set forth in the documents produced in response to defendant's First Request for Production.**

18. With respect to allegations set forth in paragraph 7 of Count One of the complaint wherein you allege "JMS recklessly, willfully and knowingly violated plaintiff's rights under the Age Discrimination in Employment Act…," identify: all facts

that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response:  See the response to Interrogatory 3 above including plaintiff.**

19.  With respect to the allegations set forth in paragraph 9 of Count One of the complaint wherein you allege "the January 11, 2002 letter of termination was a pretext and was an act of discrimination and retaliation on the basis of age by defendant JMS which had embarked upon a course of conduct in which defendant JMS's agents humiliated her, embarrassed her, denied her the resources to do her job, isolated her, inflicted extreme emotional distress and trauma upon her, impaired her ability to perform her job and impaired her prospects to secure alternative future employment in the securities industry, "identify: all facts that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response:    See responses to Interrogatories 1- 18 above.    Plaintiff has identified facts that support the allegations in her complaint.**

20.  With respect to the allegations set forth in paragraph 12 of Count One of the complaint wherein you allege "plaintiff endured harassment and threats against her employment by managers at JMS, and was unjustifiably questioned about

13

medical expenses and endured unconscionable delays in the payment of medical expenses…, "identify: all facts that support these allegations; all persons with knowledge of these allegations, including the names of all manager(s) who allegedly harassed and threatened plaintiff; all documents concerning these allegations; and identify, with as much specificity as possible, the alleged harassment and threats.

**Response: MaryAnn Melchiorre and others identified in Response to Interrogatory #3 above.**

21.  With respect to the allegations set forth in paragraph 17 of Count One of the complaint where you allege "the prospect of alternative future employment in the securities industry has been impaired by these and other unlawful discriminatory and retaliatory acts of defendant JMS, "identify: all facts that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response:  In addition to the acts described in plaintiff's complaint and in the responses to these interrogatories, the U-5 prepared by defendant JMS is a complete impediment to future employment within the securities industry.**

22. With respect to the allegations set forth in paragraph 7 of Count Two of the complaint wherein you allege "JMS recklessly, willfully and knowingly violated

plaintiff's rights under Title VII of the Civil Rights Act of 1964…," identify: all facts that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response: See the response to Interrogatory 3 above.**

23.  With respect to the allegations set forth in paragraph 18 of Count Two of the complaint wherein you allege "JMS did commit these acts of discrimination and retaliation against plaintiff on account of her gender and did create and maintain a hostile work environment for plaintiff because of her gender…," identify: all facts that support these allegations; all persons with knowledge of these allegations; all documents concerning these allegations.

**Response: See the response to Interrogatory 3 above.**

15

## CERTIFICATION

I hereby certify that I have reviewed the above Interrogatories and responses

thereto and that they are true and accurate to the best of my knowledge and belief.

*Cheryl Coudert*

CHERYL COUDERT

Subscribed and sworn to before me this _21st_ day of October, 2003.

*Mary Ann Gabor*

Notary Public

**MARY ANN GABOR**
**Notary Public of Connecticut**
**My Commission Expires October 31, 2006**

16

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was mailed, postage prepaid on

this 2-1 day of October, 2003 to:

Marc L. Zaken
John G. Stretton
Edwards & Angell, LLC
Three Stamford Plaza
301 Tresser Blvd.
Stamford, CT 06901

ANDREW B. BOWMAN

17

*EXHIBIT B*

Deborah Link, M.D.
97 Marvin Ridge Road,
New Canaan, CT 06840
203-966-8059

February 9, 2004

Andrew Bowman, Esq.
1804 Post Road East
Westport, CT 06880

Re: Cheryl Coudert, Plaintiff Docket No: 3:03CV0324 (MRK)
Vs. Janney Montgomery Scott, LLC

Cheryl Coudert has been my patient since her extremely brief (and questionably necessary) hospitalization at Silver Hill Hospital in February of 1997. A review of her medications and symptoms during that admission for "detoxification" reveal that with only minor Valium doses she had virtually no withdrawal symptoms other than minor anxiety and pressured speech. Cheryl's usual bright-minded loocquatiousness may then have seemed like a symptom. However, Cheryl's usual communications are fed by her very quick mind, her unusually precise memory and by an easy way of relating verbally and socially. There never has been any evidence of sociopathy or of paranoid thinking. Cheryl has long friendships and has a cordial relationship with her extended family of origin as well as that of her husband. . Ms. Coudert and her husband were never able to have children: She has consistently been a faithful aunt to her their many nieces and nephews.

Since March of 1987, ten years before I first met Ms. Coudert has been the sole salary earner and caretaker of her somewhat older husband who, before I met her, was already disabled and had been formally told he could not go back to work because of his serious cardiac illness. He had previously been employed at IBM. During the period since 1997 Rene has had several hospitalizations, one for emergency cardiac surgery during the last seven years.

Throughout this seven-year period I have seen Cheryl weekly and therefore know her well. I have prescribed no medication at all. Since the inception of our psychotherapy there has not, to my knowledge, been a single episode of any dysfunction related to alcohol. In fact, our session throughout this time has been scheduled at 8:10 in the morning and she has (with the exception of s couple bouts of asthmatic bronchitis) met every appointment. She has come right on time and with a clear cerebrum. She has been responsible in paying my bills.

When I began with Cheryl she was already in a toxic situation with regard to her employment as a stock broker at Janney in the Darien office of that company, the office nearest to her home in New Canaan. In light of that conflicted relationship I told Cheryl that in order to work with her effectively without the specter of disclosure to her employers overhanging the therapy that I would not be making notes after each session.

I can speak to continual high level of working stress that Ms. Coudert met with when she was moved to the Fairfield office of Janney. That move had, it is thought, been arranged to make a better place for her to work since the Darien office had some leadership problems. If anything, the stressors increased once she had moved to the Fairfield office. The Fairfield office of Janney seemed to be including her

appropriately as a senior broker, especially since she came with a good "book" (i.e. of clients with significant amounts of invested funds). It is my understanding that many of her clients were not of an age that they required (or would have tolerated) a lot of trading in their holdings. The working situation seemed to be aberrant soon after her arrival. Frequently she would try to make appointments with the head of the office who often would leave by the back door so as not to confront her. Despite there being unused, private (appropriate) closed-in office working desks, she was never moved from what had seemed at first to be a temporary desk adjacent to the brokers' clerks, the sales aides. She was moved, late in the period of employment into a windowless cubby with another broker. One year she was begrudgingly given the prize trip somewhere, grudgingly as if her numbers were somehow not sufficient, yet there they were. Coudert is in general a gregarious soul and yet it seemed that that capacity for drawing people together for lunch or firm-based small celebrations was never valued.

Ms. Coudert, prior to her Silver Hill Hospitalization in 1997, had been medicated by another psychiatrist with an antidepressant, Zoloft. I have never found her to have depressive illness. In fact I have never felt that a mood disorder diagnosis was relevant to her and so I have never prescribed any medications for that. Her anxiety has been well managed with the psychotherapy. That does not mean, however, that she has been unaffected by the persistent lack of professional support and finally discontinuation of her employment with Janney. Cheryl's central identity and purpose outside her marriage was that of a professional woman This has been effectively destroyed by the actions of Janney. She had always been a working woman and took pleasure and pride in doing well by her clients many of whom she had for many years, even to the second generation. If there ever were client complaints I was never informed of them. She was born in 1944 (so she is significantly younger than I), and I believe this fact has been an important determinant over this past decade. The way this seems to have worked itself out is not directly, but rather indirectly. She never had needed time off or special consideration for the needs of children. Her parents had died before this period and all other immediate family lived at a fair distance.

Ms. Coudert did, however, (especially since there were no children to help share the burden) have to take the full burden of a chronically disabled and then an acutely sick husband who has more than once required emergency cardiac surgery. To my memory there were NO outpourings of support or sympathy for her despite the clear fact that Rene could well have died. It is not clear to me even in retrospect whether this lack of support for her was driven by callousness on the part of the Fairfield and Pennsylvania management of Janney or whether it derived from her position as "an older" (though always elegantly turned out) employee or whether it derived from her position as an female who, like most other females in the world, find themselves at one time or another in the role of primary caretaker for the ill or disabled.

The fact that Ms. Coudert has been in continuous psychotherapy during this immensely stressful employment and then dis-employment period lends a witness to the continuing psychic toll this has caused my patient. The fact of her ongoing therapy, it must be emphasized, has served to stabilize her, to support her in such a way that she did not decompensate nor did she retreat into alcohol. Her significant anxiety made it difficult during the worst of it to concentrate on the positive part of her life – that part in which she literally was the life-saving mainstay of her husband.

When evaluating Ms. Coudert's response to this continuously egregiously stressful work situation it must be made clear that Ms. Coudert is not a whiner, nor has she fallen apart. My retake on the hospitalization in 1997 is that the acute drinking was just as likely a result, not a cause, of the toxic employment situation in the Darien office of Janney. There subsequently was a change of management in that office.

It must be made clear that the way they treated her has, effectively, made it impossible for her to find new employment at her lifelong work. The brokerage "world" of Fairfield County is indeed very in-bred and small.

Ms. Coudert suffered deeply a result of not being able to support herself. She suffered from being cut off from the collegial connection with the other brokers. She held herself together and the despair and rage at what was happening to her were worked out in her therapy so she never did need other hospitalizations or medical interventions. Her anxiety is back under tolerable control, she has become able to sleep properly and, overall, she has again become healthy enough to be the mainstay of her ill husband, Rene.

She has done well to hold her head up high even as she saw her livelihood distributed to other brokers within the Janny firm.

Diagnosis:  Initially, at Silver Hill, DSM IV 303.90 Alcohol Dependence
            Currently that is in remission, there have been no further alcohol related incidents.
            Current GAF above 90 (at Silver Hill it was 30 at admission and 60 at discharge)
            She had no Axis II diagnosis and the Axis IV Psychosocial stressors are currently high due to the work situation. Her asthma is in good control, otherwise she has been physically well.

Respectfully submitted,

Deborah Link MD

Deborah Shaw Link, MD
Board Certified Psychiatrist and Psychoanalyst
CT Lic. #16891