UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHERYL COUDERT, | : | |
| Plaintiff, | : | |
| VS. | : | DOCKET NO: 3:03CV0324(MRK) |
| JANNEY MONTGOMERY SCOTT, LLC, | : | |
| Defendant | : | DECEMBER 20, 2004 |

**COUNTER AFFIDAVIT OF PLAINTIFF**
**CHERYL COUDERT**

Cheryl Coudert, having been sworn, deposes and says:

1. I was born on June 23, 1944; I am a female. I was 57 years of age when I was terminated from my employment with Janney Montgomery Scott (hereinafter JMS) on January 11, 2002.

2. I commenced employment with Janney Montgomery Scott in 1995, and I was employed in the Darien office from 1995 through early 1997. At the time I was employed in the Darien office, I was the only female broker (Ex. 1, pg. 282).

3. While employed at JMS I held a Series 7 License which authorized me to sell stocks, bonds and mutual funds. I was authorized to buy and sell options as well

as life insurance and variable rate annuities. I was also authorized to sell managed money products. I was qualified to perform my job.

4. Throughout the course of my tenure in Darien, I was brow beaten, isolated, humiliated, screamed at and denied the resources necessary to do my job as a registered representative at JMS, and I believe that Mr. Engelskirger's conduct toward me was motivated by my age and gender (Ex. 1, pg. 282).

5. On December 18, 1995 Mr. Engelskirger delivered a letter to me stating that if he did not receive my resignation by December 19, 1995 he will terminate my employment at the close of business on December 20, 1995. (Ex. 2). On December 19, Mr. Engelskirger delivered a handwritten note telling me to "disregard my letter of yesterday". (Ex. 3). This was one of many threats against me delivered both orally and in writing.

6. I was transferred from Darien to Fairfield in early 1997. This was a deliberate decision by management at JMS who chose to punish me by transferring me away from the geographic area in which my clients resided rather than correcting the discriminatory behavior that was being exhibited toward me by Jack Engelskirger. (Ex. 1, pg. 282).

7. By December 1995, I was under a tremendous emotional strain which was a direct result of the constant humiliation that I was subjected to by Jack Engelskirger. I sought psychiatric treatment from Dr. Bruce Shapiro, then Chief Psychiatrist of Stamford Hospital who diagnosed me with "Traumatic Stress Reaction" and placed me on medication.

8. Engelskirger threatened to terminate my employment at any time "for any reason". I was isolated as the only female broker in the Darien office, and it appeared to me that Engelskirger sensed that I was vulnerable and he never relented in his constant attempts to humiliate and embarrass me. Engelskirger's comments directed to me included "I was the worst victim type in the office".

9. After the Christmas holidays I returned to work to learn that the computer terminal utilized by me which contained all of my customer account balances and history had been removed and given to a sales assistant with no book of business and with no reason given by Mr. Engelskirger. I was moved to an even noisier area of the office and required to share a machine with another broker which location was not conducive to communicating with my clients. All other brokers who were all males had their own machines.

10. On July 25, 1996 I wrote a letter of complaint to James Wolitarsky, then the CFO of JMS and now the President of JMS. In this letter I asked for help from James Wolitarsky seeking assurance that Engelskirger's course of conduct would not continue (Ex. 4).

> "In summary, it is the deliberate nature of Jack's attacks that have gone on far too long and at great expense and damage to me personally and professionally. I want to make it clear that I am trying to solve this problem internally with as few people involved as possible. I also want to be clear that this course of conduct cannot and will not continue."

I never received a response from Mr. Wolitarsky. On February 20, 1997 my attorney wrote to Mr. Wolitarsky enclosing a copy of Ex. 4, since there had been no response to my letter of July 25, 1996. (Ex. 5).

11. After my hospitalization at Silver Hill in February 1997, I sought to return to the Darien office, because it was the office closest to my client base.

12. Over my objection and the objection of my psychiatrist, Dr. Bruce Shapiro (Ex. 6), I was forced to report to the Fairfield office which I did on March 6, 1997. The manager, John Fortuna, was out of the office for the week. The assistant manager had no idea what I was doing there. This was a punitive transfer, because it took me

away from my client base, and resulted in continuing isolation, denial of resources to do my job and continuing threats against my continued employment with JMS.

13. In attorney Neigher's letter to Wolitarsky dated February 20, 1997 (Ex. 5), my distress over a misrepresentation made to me about financial coverage for hospital expenses at Silver Hill was expressed. Ex. 5, par. 3. Both Engelskirger and Doyle represented to me that all of my expenses at Silver Hill would be fully covered by JMS, but JMS reneged claiming that Silver Hill was "out of network", a status never raised when JMS insisted I get treatment and agreed to Silver Hill Hospital.

14. My attorney, in a March 6, 1997 letter to Howard Scherer, Director of Compliance at JMS, specifically complained that my denial of access to the Darien office was a result of the unexpressed intentions of Mr. Engelskirger as follows:

> Is it because, as we suspect, Mr. Engelskirger is totally unable to deal with a woman broker any better than he deals with his male brokers? But most important, after weeks of treatment and stress, what does JMS think it is accomplishing by isolating Ms. Coudert in an office where no one knows her, at a distance from her clients? (Ex. 7).

15. I tried not to be vulnerable, and it was extremely difficult to put up with his demeaning comments. JMS was clearly discriminating against me on account of my age, since Engelskirger, and later Avallon and Fortuna in Fairfield, tried to portray me

5

as an over-the-hill, washed-up, has-been broker by the way they treated me and where they put me. I had no sales aide in Darien and no private office while other men did. I remained in the bullpen.

16. When JMS moved me to Fairfield, it was not clear to me what their intentions were until the office expanded and there was room to give me an office, but those offices became storage rooms (Ex. 1, pg. 287).

17. From March 1997 through October 1997 my production increased dramatically. In November 1997 I was left in the bullpen even while the office was physically expanding. There were three empty offices. I continued to be relegated to the bullpen.

18. In May 1998 I once again asked the branch manager, Richard Avallon, for an office and a sales aide. I told him that being in the bull pen was affecting my productivity. On December 21, 1998, Dick Avallon informed me that I will receive a cut back to 25% payout on all business. I objected, reminding him, that I had requested help back in May and nothing was done about it. There are now four empty offices.

19. In January 1999 Avallon asked me to write a sales plan that he would use as a talking paper with Larry Doyle, the regional manager, in order to get my payout

re-established. I spent hours writing the sales plan but never heard any response after I submitted the plan from any member of management at JMS in Fairfield; Fortuna or Avallon or Philadelphia; Doyle or Wolitarsky.

20. In the summer of 1999 there were various interns, cold callers and brokers' daughters. While they operated from private offices, I was forced to remain I the bullpen.

21. In September 1999 I was called into a conference room by John Fortuna who then had the title of branch manager "emeritus". Fortuna berated me for calling and complaining to Jim Wolitarsky and threatened me by stating that I would be terminated and lots of lawsuits would result. When I tried to explain what my needs were, Fortuna abruptly stood up and left the room.

22. I called Wolitarsky and complained that I was being harassed and threatened by Fortuna, and he said he would take care of it.

23. In October 1999 Wolitarsky visited the Fairfield office where I was still in the bullpen.

24. On October 20, 1999 my husband was hospitalized on an emergency basis and underwent aortic valve surgery on October 29, 1999. I was in and out of the office during this period of time.

25. On November 5, 1999 I returned to the office to find a fax draft of a memo to me in a blank sealed envelope. There was mention of a sensitive fax addressed to Dick Avallon that had disappeared and clearly this was that memo. (Ex. 8).

26. On November 12, 1999 I went into the office and found that the smallest office of those available had been assigned to me and to Jack Henriques. There were still four empty offices available. There was one window which was an interior window which gave one a full view of the bullpen. It was like a closet.

27. In December 1999 Dick Avallon called me from Philadelphia where he was attending a manager's meeting and asked me to meet with Larry Doyle the next morning. Doyle was complaining about the medical bills regarding Rene and tells me there is a rumor that I am going to sue JMS. I had complained, because there was a delay in prosecuting my husband's medical claims by JMS in Philadelphia.

28. From January 2000 through March 2000 my business is doing well with bookings at $62,500. I am encouraged because a memo had been sent out that brokers must do $62,500 by June or there would be a 25% pay cut. My pay check was still at 25% in April. During April I brought in an additional $12,000 in business.

29. In May 2000 my pay is still at 25%. I went to Dick Avallon and explained that I had booked $75,000 plus and needed my salary particularly because of my

husband's medical condition and having to hire extra medical personnel to help. Avallon told me that Larry Doyle had left JMS; and a new regional manager was coming to the company on July 1, and that as a result I would have to wait to discuss my salary situation with him.

30. In July 2000 I continued to ask Dick Avallon to talk to Ash Eldredge, the new regional manager about reinstating my full payout.

31. During the period throughout 2001 I was demoralized, because it was clear to me that management had decided to drive me out of JMS, and their motivation was that I was old, over the hill, washed up and a has-been.

32. My productivity diminished during 2001, because they just beat me down.

33. The management at JMS engaged in a concerted effort to drive me from my employment. Engelskirger's conduct toward me was the beginning of a continuous effort to wear me down and humiliate me, because of my age and my gender. When JMS finally terminated me in January 2002, John Fortuna and Dick Avallon first demanded my resignation. They were doing everything possible even to foreclose my ability to sue or to make a claim of age and gender discrimination against JMS. Management continued to deny me dignity, deny me the resources to do my job and was deliberately and continuously cold and indifferent to my numerous

and consistent requests that I tried to frame in as thoughtful and careful a manner as I was able. Instead they retaliated against me because of my age and gender.

34. The office with Jack Henriques was a closet, and was calculated to diminish my ability to produce and to break my spirit.

35. My firm conviction that JMS was motivated because I was older and they wanted to be rid of me is based upon the action and deeds of managers Richard Avallon, John Fortuna, Jack Engelskirger, Jim Wolitarsky, Ash Eldredge and Larry Doyle who all turned a deaf ear to my pleas for help in doing my job and refused to provide any support. They looked at me with disdain and made it clear that their perception of me was that I was old and washed up.

36. My lack of production was a direct result of the discriminatory treatment I received at the hands of these managers who retaliated against me for my specific oral requests and complaints I made during my tenure with JMS in Stamford and Fairfield and my written complaints to Jim Wolitarsky in July 1996 (Ex. 4) and to Ash Eldredge in 2000. (Ex. 9).

37. The filing by defendant JMS of the U-5 in which it is stated " Terminated for LACK OF PRODUCTION" was an act of discrimination against me on account of

my age and gender which has effectively precluded me from obtaining alternative employment in the Securities industry.  (Ex. 10)

_____
CHERYL COUDERT

Subscribed and sworn to before me this \_\_\_\_\_ day of December, 2004

_____
NOTARY PUBLIC

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was mailed, postage prepaid on this _____ day of December, 2004 to:

John G. Stretton, Esq.
Edwards & Angell, LLC
Three Stamford Plaza
301 Tresser Blvd.
Stamford, CT 06901

_____
ANDREW B. BOWMAN