UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHERYL COUDERT, | : | |
| Plaintiff, | : | |
| VS. | : | DOCKET NO: 3:03CV0324(MRK) |
| JANNEY MONTGOMERY SCOTT, LLC, | : | |
| Defendant | : | MARCH 30, 2005 |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF
LAW RE: HOSTILE WORK ENVIRONMENT**

In response to the Court's direction, plaintiff Cheryl Coudert submits this memorandum to address issues related to the hostile work environment she endured at defendant Janney Montgomery Scott. Under Title VII, and by analogy the ADEA, the Supreme Court "ha[s] repeatedly made clear that although the statute mentions specific employment decisions with immediate consequences, the scope of the prohibition 'is not limited to 'economic' or 'tangible' discrimination…and that it covers more than 'terms' and 'conditions' in the narrow contractual sense.'" Faragher vs. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 2282-83 (1998); quoting,

Harris vs. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993); Oncale vs. Sundowner Offshore Services, Inc., 523 U.S. 75, 79, 118 S. Ct. 998, 1001 (1998).

In the context of sexual harassment, the Supreme Court has held that a sexually objectionable environment must be both objectively and subjectively offensive, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Harris vs. Forklift Systems, Inc., 510 U.S. at 21-22, 114 S.Ct. at 370-371. Courts determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances, " including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,…and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. at 371, Faragher, 524 U.S. at 788, 118 S.Ct. at 2283.

In this case, the plaintiff's affidavit, exhibits in support of her counteraffidavit, her Local Rule 56(a)2 Statement and citations in her Memorandum in Opposition demonstrate that beginning with plaintiff's tenure in defendant's Darien office, she was brow beaten, isolated, humiliated, screamed at and denied the resources to do her job as a registered representative at JMS. (Plaintiff's Aff. Par. 4, Ex. 1, par. 282). She was the only woman in Darien, and she was fired by manager Engelskirger and

subsequently rehired when he caused his firing of her to be rescinded. Rather than correcting the behavior of Mr. Engelskirger, JMS punitively transferred plaintiff from Darien to Fairfield in early 1997 (Plaintiff's Aff. Par. 6). This transfer took plaintiff away from the geographic area in which her clients were located thus impeding her ability to her job.

In December 1995 plaintiff sought psychiatric treatment with Dr. Bruce Shapiro, then Chief Psychiatrist of Stamford Hospital who diagnosed her with "traumatic stress reaction" and placed her on medication (Plaintiff's Aff. Par. 7). This did not stop Engelskirger who threatened to terminate plaintiff's employment at any time "for any reason". She was isolated as the only female broker in the Darien office, and Engelskirger clearly sensed her vulnerability and never relented in his constant attempts to humiliate and embarrass her. He called her the "worst victim type in the office." (Plaintiff's Aff'd. Par. 8). After the Christmas holidays in December 1995 she returned to work finding that the computer terminal utilized by her which contained all of her customer account balances had been removed and given to a sales assistant with no book of business and no reason given by Mr. Engelskirger. All male brokers had their own machines. (Plaintiff' Aff. Par. 9).

On July 25, 1996 plaintiff wrote a letter of complaint to James Wolitarsky, then the CFO of JMS and now the President of JMS asking for help (Ex. 4). Plaintiff implored Wolitarksy to limit the deliberate attacks on her by Engelskirger and made it clear that she was trying to solve the problem internally (Ex. 4, Plaintiff's Aff'd. Par. 10). Plaintiff never received a response from Mr. Wolitarsky. Even when plaintiff's attorney wrote Wolitarsky enclosing a copy of Ex. 4, seven months later, Wolitarsky deliberately ignored her. (Plaintiff's Aff. Par. 10).

After her hospitalization at Silver Hill in February 1997, plaintiff sought to return to the Darien office but was denied access. Over her objection and that of her psychiatrist, Dr. Bruce Shapiro (Ex. 6), she was compelled to report to the Fairfield office which she did on March 6, 1997 (Plaintiff's Aff. Par. 12). The assistant manager had no idea what plaintiff was doing in Fairfield. The manager at the time was John Fortuna, but Fortuna was out of the office for a week. (Plaintiff's Aff. Par. 12).

On March 6, 1997 the plaintiff's attorney wrote to attorney Scherer, Director of Compliance at JMS, specifically complaining that the denial of access to the Darien office was the result of the intentions of Mr. Engelskirger (Plaintiff's Aff. Par. 14, Ex. 7). No one in Fairfield knew Cheryl Coudert, and her transfer was punitive and

constituted an exile. While in Darien, plaintiff had no sales aid and no private office while men did (Plaintiff's Aff. Par. 15).

After plaintiff's move to Fairfield, JMS expanded and although there was room to give her a private office, those offices were withheld and became storage rooms. (Plaintiff's Aff'd. par. 16, Ex. 1, pg. 287). Notwithstanding an increase in her production between March 1997 and October 1997 she was left in the bullpen notwithstanding the expansion of the offices. In May 1998 plaintiff requested of branch manager Richard Avalon an office and a sales aid. She told Avalon that being in the bullpen was affecting her productivity. JMS left her in the bullpen. On December 21, 1998 JMS cut her payout to 25% on all business. When plaintiff objected reminding Avalon that she had requested help back in May and was ignored, Avalon did not relent.

In January 1999 Avalon told plaintiff to write a sales plan he would use as a talking paper with regional manager Larry Doyle in order to get her payout reestablished. She submitted a detailed sales plan but never received any response from anyone in management in Fairfield; Fortuna or Avalon or Philadelphia; Doyle or Wolitarsky.

5

In September 1999 plaintiff was called into a conference room by John Fortuna who then had the title of branch manager "Emeritis". He berated her for calling and complaining to Wolitarsky and threatened plaintiff by stating that she would be terminated and lots of lawsuits would result. When plaintiff tried to respond, Fortuna abruptly stood up and left the room. (Plaintiff's Aff. Par. 21). Plaintiff called Wolitarsky in Philadelphia and told him she was being harassed and threatened by Fortuna, and Wolitarksy said he would take care of it. In October 1999 Wolitarsky visited the Fairfield office where she was still in the bullpen (Plaintiff's Aff. Par. 22-23).

On November 12, 1999 she was finally assigned the smallest office of those available that she was compelled to share with Jack Enriques. There were still four empty offices available; there was one window which was an interior window. It was like a closet. (Plaintiff's Aff. Par. 26). In December 1999 Avalon calls plaintiff from Philadelphia where he is attending a managers meeting and asks plaintiff to meet with Larry Doyle, the regional manager, the next morning. Plaintiff meets with Doyle who then complains about the medical bills submitted in behalf of plaintiff's husband and tells plaintiff there is a rumor she is going to sue JMS (Plaintiff's Aff. Par. 27).

In May 2000 her payout is still at 25%, and plaintiff goes to Avalon and explains she had booked $75,000 plus and needed her salary because of her husband's medical condition and having to hire extra medical personnel to help. Avalon told plaintiff that a new regional manager was coming to the company on July 1 and that as a result she would have to wait to discuss her salary situation with him. (Plaintiff's Aff. Par. 29).

In July 2000 plaintiff continued to ask Avalon to talk to Ash Eldredge, the new regional manager, about reinstating her full payout (Plaintiff's Aff. Par. 30). Plaintiff's testimony is that during the period 2001 she was demoralized, because it was clear to her that management had decided to drive her out of JMS, and their motivation was that she was old, over the hill, washed up and a has been. (Plaintiff's Aff. Par. 31). Her productivity diminished during 2001 "because they just beat me down". (Plaintiff's Aff. Par. 32). Plaintiff's observation was that management at JMS including Fairfield and Philadelphia engaged in a concerted effort to drive her from her employment. Engelskirger's conduct toward her was the beginning of a continuous effort to wear her down and humiliate her because of her age and her gender (Plaintiff's Aff. Par. 33). Even when JMS finally terminated her in January 2002, Fortuna and Avalon first demanded her resignation (Plaintiff's Aff. Par. 33).

This was done by JMS in a blatant attempt to foreclose even her ability to sue or to make a claim of age or gender discrimination against JMS.  Throughout her employment, management continued to deny her the resources to do her job and continuously humiliated her and remained deliberately and continuously indifferent to her consistent requests for help that she tried to frame in as thoughtful and careful a manner as she could.  Instead they retaliated against her because of her age and gender (Plaintiff's Aff. Par. 33).

In answer to the Court's inquiry at oral argument, plaintiff respectfully invites the Court's attention to par. 21 of her Local Rule 56(a)2 Statement  wherein it is clear that John Fortuna and Charles Cook, although older than plaintiff, were the branch manager "Emeritis" and a former Chairman of the Board of JMS respectively.  (Ex. Pg. 61).  The chain of command was Avalon and Fortuna in Fairfield to Doyle, regional manager in Philadelphia, to Wolitarsky then CFO and subsequently CEO.

The tangible employment actions taken against plaintiff by JMS including the denial to her of resources that men had, her isolation, her relegation to the bullpen, the decrease in her salary, the punitive transfer to Fairfield, the deliberate indifference to her repeated requests for help and their treatment of her as a washed

up-has been broker, the threats to fire her, all of which were calculated to break her will, finally forced her from her employment by pretextual termination.

Policy makers were clearly involved in decisions at virtually every single stage. Even the decision in November 1999 to put her in an office with Enriques with no window came from a memo faxed from Mr. Wolitarsky (Ex. 8) who was then the CFO of JMS.

Even her psychiatrist, Deborah Link, M.D., corroborates the "continual high level of working stress that Ms. Coudert met with when she was moved to the Fairfield office of Janney…" "If anything, the stressors increased once she had moved to the Fairfield office." "The fact that Ms. Coudert has been in continuous psychotherapy during this immensely stressful employment and then dis-employment period lends a witness to the continuing psychic toll this has caused my patient". Report of Deborah Link, M.D., dated February 9, 2004.

"When the work place is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated". Harris vs. Forklift Systems, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed. 2d, 295 (1993); Dawson vs. County of Westchester, 373 F.3rd 265, 272 (2nd Cir. 2004). To determine

whether a plaintiff has established a hostile work environment claim, the totality of circumstances must be considered including frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating or whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23, 114 S.Ct. 367; Dawson, 373 F.3rd at 272. While no single factor is required, the crucial inquiry focuses on the nature of the work place environment as a whole. Id. The Second Circuit has specifically held that "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." Dawson, 373 F.3rd at 273 citing, Torres vs. Pisano, 116 F.3rd 625, 631 (2nd Cir. 1997).

     Here, JMS and its managers literally beat plaintiff into submission. Their weapons were denial of resources, humiliation, punitive transfer, decrease in pay, isolation, deliberate indifference to her reasonable complaints and requests for help, threats of termination and finally termination and retaliation. Although the Second Circuit in Dawson and Torres has specifically held that employers may escape liability in all but the most egregious cases, this was an egregious case.

     For these reasons as well as those submitted in previous memoranda and at oral argument, defendant's motion for summary judgment should be denied.

          THE PLAINTIFF,
          CHERYL COUDERT


BY_____
  ANDREW B. BOWMAN, ct00122
  1804 Post Road East
  Westport, CT 06880
  (203) 259-0599
  (203) 255-2570 (Fax)
  e-mail: andrew.bowman@snet.net

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was mailed, postage prepaid on this 30th day of March, 2005 to:

John G. Stretton, Esq.
Edwards & Angell, LLC
Three Stamford Plaza
301 Tresser Blvd.
Stamford, CT 06901


_____
ANDREW B. BOWMAN